IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DOROTHY JUANITY RAE COX,    )
    Plaintiff,    )
        )
    v.    )    CIVIL NO. 3:12cv668 (JAG)
        )
CAROLYN W. COLVIN,    )
Commissioner of Social Security,    )
    Defendant.    )
_____)

## REPORT AND RECOMMENDATION

Dorothy Juanita Rae Cox ("Plaintiff") is 36 years old and previously worked as a cashier and waitress. On June 17, 2005, Plaintiff applied for Social Security Disability ("DIB") and Supplemental Security Insurance ("SSI") under the Social Security Act (the "Act"), claiming disability due to bipolar disorder, drug and alcohol dependence and abuse, borderline intellectual functioning, a complex partial seizure disorder, asthma, a myofascial pain syndrome, an overactive bladder with urinary incontinence and migraine headaches, with an alleged onset date of June 15, 2002. Plaintiff later amended the alleged onset date to May 25, 2005, by which time she was no longer insured for the purposes of DIB; accordingly, the current claim is for SSI only. Plaintiff's SSI claim was presented to an administrative law judge ("ALJ"), who denied her request for benefits. The Appeals Council subsequently remanded Plaintiff's claim for a second hearing, after which the ALJ again denied Plaintiff SSI benefits.

Plaintiff now challenges the ALJ's decision, claiming that the ALJ improperly assigned less than controlling weight to Plaintiff's treating physicians' opinions and relied upon flawed

vocational expert ("VE") testimony when reaching his final decision. (Pl.'s Mot. for Summ. J. and Br. in Supp. "Pl.'s Mem." (ECF No. 12) at 4, 8.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g) on Plaintiff's Motion for Summary Judgment (ECF No. 12) and Defendant's Motion for Summary Judgment (ECF No. 14).[1] For the reasons set forth herein, the Court recommends that Plaintiff's Motion for Summary Judgment be DENIED; that Defendant's Motion for Summary Judgment be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges the ALJ's decision to assign less than controlling weight to Plaintiff's treating physicians' opinions and argues that the ALJ erred by relying upon flawed VE testimony in reaching his final decision. Accordingly, Plaintiff's education and work history, Plaintiff's medical history, Plaintiff's treating physicians' opinions, non-treating state agency physicians' opinions, Plaintiff's reported activities of daily living, a third party function report, Plaintiff's hearing testimony and the VE's testimony are summarized below.

A. Plaintiff's Education and Work History.

Plaintiff has a tenth grade education and received no special job training or vocational schooling. (R. at 127.) She worked as a cashier and waitress at a number of gas stations and restaurants from 1992 until 2002, where her job duties included taking orders, bussing tables, lifting up to twenty five pounds and interacting with customers. (R. at 60, 64-65.) Between 2002 and 2003, Plaintiff worked at a campground, where she raked leaves and cleaned

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

bathrooms.  (R. at 60, 1524.)  In 2005, Plaintiff moved to a farm, where she helped feed and raise

pigs, chickens and ducks.  (R. at 1522-23.)  She stopped taking care of the animals after she was

diagnosed with a hay allergy in 2005. (R. at 1523.)

B.  Plaintiff's Medical Records.

1.  Plaintiff's Physical Treatment Records.

On January 7, 2003, Plaintiff sought treatment at Westmoreland Medical Center, where

Colleen Collins, F.N.P. diagnosed Plaintiff with tobacco dependency and asthma.  (R. at 401.)

Plaintiff reported noncompliance with her previous asthma medications, but she self-medicated

with her son's Azmacort, which caused negative side effects.  (R. at 401.)  Ms. Collins advised

Plaintiff to quit smoking.  (R. at 401.)

Plaintiff went to the Emergency Department of Riverside Tappahannock Hospital on

January 14, 2003, with complaints of lower abdominal pain.  (R. at 487.)  Dr. John T. Carmack,

M.D. diagnosed a urinary tract infection and prescribed medication. (R. at 487.)  Dr. Carmack

noted that Plaintiff was alert and oriented in person, place and time and displayed normal

respiratory function.  (R. at 488.)  Plaintiff's mood was normal.  (R. at 490.)

Plaintiff returned to the Emergency Department on May 22, 2003, again complaining of

pelvic pain.  (R. at 499.)  Dr. James R. Dudley, M.D. diagnosed ovarian cysts and uterine

fibroids and prescribed Ibuprofen and Protonix.  (R. at 499.)  Dr. Dudley assessed Plaintiff as

alert and oriented in person, place and time, with normal respiratory and cardiac function.  (R. at

500.)

On September 29, 2004, Plaintiff saw Dr. Ofer Feder, M.D. at Gastrointestinal

Specialists, complaining of heartburn.  (R. at 411.)  Dr. Feder indicated that Plaintiff smoked up

to one pack of cigarettes per day and drank a shot to a pint of liquor at least once per week,

3

activities which exacerbated her condition.  (R. at 411, 413.)  Plaintiff breathed normally, displayed no cardiac irregularities and was alert and oriented.  (R. at 412-13.)

Plaintiff sought treatment for chest pain from Dr. Archer Baskerville, M.D. on February 16, 2005.  (R. at 669.)  Dr. Baskerville recorded that Plaintiff did not work, smoked half a pack of cigarettes per day and smoked marijuana on a daily basis.  (R. at 669.)

On April 20, 2005, Plaintiff saw Dr. Lisa Haynie, M.D. for a complete physical examination.  (R. at 389.)  Dr. Haynie recorded that Plaintiff drank alcohol and smoked an ounce of marijuana per day, sometimes in conjunction with her seizure medications.  (R. at 389.) Plaintiff informed Dr. Haynie that Dr. Mark, Plaintiff's psychiatrist, told Plaintiff it was "okay" to smoke marijuana in conjunction with psychiatric medication.  (R. at 389.)  Dr. Haynie advised Plaintiff to abstain from marijuana and alcohol while on psychiatric medications.  (R. at 389.)

Plaintiff returned to Dr. Haynie on April 29, 2005, to discuss lab results from her April 20 visit.  (R. at 388.)  The only abnormal finding was a urine drug screen, which was positive for marijuana.  (R. at 388.)

Plaintiff sought treatment from Dr. Cletus Aralu, M.D. for seizure activity and migraine headaches on June 7, 2005.  (R. at 350, 389.)  Dr. Aralu diagnosed complex partial seizure disorder and prescribed Topamax and Zanaflex for Plaintiff's seizures and Imitrex for her headaches.  (R. at 351.)  Dr. Aralu indicated that Plaintiff drank alcohol, smoked up to one pack of cigarettes per day and used marijuana.  (R. at 351.)

On June 10, 2005, Dr. Lisa Haynie, M.D. noted that Plaintiff reported drinking alcohol with her seizure medications.  (R. at 386.)  On June 24, 2005, Plaintiff saw Dr. Haynie for medication review, vaginal discharge and dysuria.  (R. at 383.)  Dr. Haynie prescribed Flagyl and advised Plaintiff not to drink any alcohol while on the medication.  (R. at 383.)

Plaintiff returned to Dr. Aralu for a follow-up appointment on July 19, 2005, regarding her headaches and seizures. (R. at 347.) Dr. Aralu recorded that Plaintiff was noncompliant with her medications and experienced symptoms of seizures, although an MRI of Plaintiff's brain was within normal limits and showed no lesions. (R. at 347, 349.)

On October 25, 2005, Plaintiff returned to Dr. Feder complaining of heartburn, acid reflux and abdominal pain. (R. at 407.) Plaintiff denied any cardiac, pulmonary, musculoskeletal, neurologic or hemotologic symptoms. (R. at 408.) Dr. Feder recorded Plaintiff's cardiac and pulmonary function as normal and her appearance as alert and oriented. (R. at 408.)

Plaintiff sought treatment for chronic pain from Dr. Hillary S. Hawkins, M.D., on November 15, 2005, at Sheltering Arms Hospital. (R. at 513.) Plaintiff rated her pain as 10/10 at its worst and 5/10 at its best and reported that Percocet helped her pain, as well as sitting or lying down. (R. at 513, 517.) Dr. Hawkins recorded that Plaintiff walked slowly and had difficulty changing positions quickly. (R. at 514.) She diagnosed a chronic pain syndrome, possibly fibromyalgia, and prescribed injections of Kenalog and Marcaine. (R. at 514.)

On February 11, 2006, Plaintiff went to the Emergency Department of Riverside Tappahannock Hospital complaining of a migraine headache. (R. at 475.) Dr. John T. Carmack, M.D. diagnosed acute migraines and prescribed medication and an Epi-Pen. (R. 475.) Dr. Carmack assessed Plaintiff as alert and oriented in person, place and time, with normal respiratory and cardiac function, although he noted that Plaintiff smoked one half to one pack of cigarettes per day. (R. at 476.)

Plaintiff went to the Emergency Department of Riverside Tappahannock Hospital on March 15, 2006, complaining of pressure in her vaginal area and pain upon urination. (R. at

5

461.)  Dr. James R. Dudley, M.D. prescribed Doxydydina, Pyridium and Percocet (R. at 461.)
Plaintiff reported no breathing problems and her respiration and cardiac function were assessed
as normal.  (R. at 462.)

Plaintiff saw Ms. Collins on June 19, 2006, with complaints of urinary incontinence and
increased migraine headaches.  (R. at 659.)  Plaintiff indicated that her bladder problems had
improved with medication but that the Detrol made her migraines worse, despite Plaintiff
doubling the prescribed dosage of the headache medication Imitrex.  (R. at 659.)  Ms. Collins
advised Plaintiff to use an Oxytrol patch, to take only the prescribed dosage of Imitrex and to see
a neurologist.  (R. at 659.)

On June 29, 2006, Plaintiff went to the Riverside Tappahannock Hospital's Emergency
Department after being rear-ended in a car accident.  (R. at 447.)  Dr. Charles Routhier, M.D.
assessed acute neck strain and prescribed medication.  (R. at 447.)  Dr. Routhier reported that
Plaintiff was alert and oriented in person, place and time, and she had a normal mood and affect.
(R. at 448, 450.)  Dr. Routhier noted that Plaintiff smoked half a pack of cigarettes per day.  (R.
at 448.)  An x-ray of Plaintiff's spine showed results consistent with muscle spasm, but showed
no evidence of fracture or bony abnormality.  (R. at 451.)

Plaintiff complained of pain in her legs, feet and neck on July 6, 2006, to Dr. Hawkins.
(R. at 511.)  Plaintiff assessed that her pain ranged from eight to ten on a scale of one to ten.  (R.
at 511.)  At this time, Plaintiff took Lyrica, Percocet and Neurontin, although she did not take the
Neurontin consistently.  (R. at 511.)  Dr. Hawkins prescribed Aristocort, Toradol, Marcaine and
Mobic, and advised Plaintiff to use Neurontin more frequently.  (R. at 511.)

On July 13, 2006, Plaintiff went to the Riverside Tappahannock Hospital's Emergency
Department complaining of head, neck and back pain as a result of a car accident two weeks

earlier. (R. at 439.) Dr. Said diagnosed lumbar strain, prescribed medication and advised Plaintiff to return if the pain worsened. (R. at 439.) Dr. Said described Plaintiff as alert and oriented in person, place and time, with normal respiratory, cardiovascular and musculoskeletal function. (R. at 440.) Plaintiff's appearance and mood were normal. (R. at 442.)

Plaintiff returned to Ms. Collins with renewed complaints of urinary incontinence on August 8, 2006. (R. at 662.) Plaintiff had not used the Oxytrol, because her insurance would not pay for it. (R. at 662.) Ms. Collins assessed that Plaintiff's incontinence was "quite severe," noting that Plaintiff had to change her clothing three to four times a day and displayed chafing on her inner thighs. (R. at 662.)

On January 4, 2007, Dr. Wilson C. Merchant, M.D. performed a stress test for Plaintiff based upon which he diagnosed Plaintiff with an overactive bladder, hypermobility of the bladder neck without demonstrable stress incontinence and female urethral syndrome secondary to urethral trigonitis. (R. at 672.) Dr. Merchant prescribed Sanctura and Pyridium. (R. at 672.) During a January 18, 2007 appointment, Plaintiff reported positive results from the Sanctura. (R. at 673.)

Plaintiff sought treatment for bladder spasms from Dr. Scott Rhamy, M.D. on February 13, 2007. (R. at 673.) Dr. Rhamy noted that Plaintiff had "excellent results" with Sanctura and displayed "no further incontinence and a much more normal urinary pattern" when taking the medication. (R. at 673.)

Plaintiff experienced breathing problems on August 8, 2008, and sought treatment from Ms. Collins. (R. at 662.) Plaintiff reported that she had run out of Advair and that she had not followed up with her pulmonologist. (R. at 662.) Ms. Collins encouraged Plaintiff to follow up with the pulmonologist and advised Plaintiff to quit smoking. (R. at 662.)

Plaintiff consulted Dr. Frederick Patterson, M.D. regarding her migraine headaches and seizure activity on October 29, 2009. (R. at 732.) Plaintiff reported experiencing six migraines per month and indicated that Imitrex caused side effects of heart and breathing problems and Frovatriptan caused mild nausea, but Advil effectively relieved some of her pain. (R. at 732.) Plaintiff reported that she was noncompliant with Phenergan. (R. at 732.) Dr. Patterson prescribed Riboflavin as a migraine preventative and advised Plaintiff to take Forvatriptan and Phenergan when she felt a migraine beginning. (R. at 734-35.) Dr. Patterson recorded that Plaintiff had "reasonable control" over her seizures when she took Clonazepam and saw no reason to change her medication. (R. at 734.) Plaintiff reported drinking socially but not frequently. (R. at 733.)

      2. Plaintiff's Mental Treatment Records.

          a. Dr. Mark's Treatment.

On March 23, 2005, Laura J. Mark, M.D. diagnosed Plaintiff with bipolar disorder, possible ADHD and a seizure disorder. (R. at 635.) Plaintiff reported seizures accompanied by twitching, staring and auditory, visual, olfactory and tactile hallucinations. (R. at 636.) Plaintiff reported that the seizures occurred about three times per month. (R. at 636.) Plaintiff drank a liter of liquor on weekends and smoked marijuana daily. (R. at 636.) Dr. Mark noted that Plaintiff's cognitive functioning showed decreased short-term memory and decreased attention span. (R. at 637.) Dr. Mark prescribed a rotation of medications to see which worked best for Plaintiff and scheduled a follow-up in six weeks. (R. at 637.)

On September 27, 2006, Dr. Mark noted that Plaintiff was looking "much calmer, less irritable" and was "better able to focus and participate in discussion" of her medical status. (R. at 689.) Dr. Mark assessed Plaintiff's mood and affect as "fairly stable" and her insight and

8

judgment as "fair." (R. at 689.) Dr. Mark prescribed increasing Plaintiff's dosage of Klonopin. (R. at 689.)

On March 13, 2007, Dr. Mark saw Plaintiff for medication management. (R. at 687.) Dr. Mark noted that Klonopin was helping with Plaintiff's symptoms of twitching and with her anxiety. (R. at 687.) Dr. Mark prescribed no new medicines. (R. at 687.)

On June 12, 2007, Dr. Mark assessed Plaintiff's status as "relatively stable" and noted that Plaintiff was benefiting from the Klonopin. (R. at 686.) Dr. Mark prescribed no change in medication and scheduled Plaintiff's next appointment. (R. at 686.)

On July 23, 2007, Dr. Mark noted that Plaintiff was noncompliant with her seizure medication but suffered no side effects from the Klonopin. (R. at 682.) Dr. Mark also noted that Plaintiff faced problems focusing due to flashbacks from PTSD. (R. at 682.)

### b.  Dr. Sheth's Treatment.

On October 10, 2007, Plaintiff saw Dr. Parvith Sheth, M.D. for medication management. (R. at 746.) Plaintiff exhibited psychomotor agitation, pressured speech and racing thoughts. (R. at 746.) Plaintiff reported sleeping from nine at night to six in the morning. (R. at 746.) Plaintiff seldom had anxiety or panic attacks. (R. at 746.) Plaintiff used alcohol, but denied any illicit drug use. (R. at 746.) Plaintiff denied any auditory or visual hallucinations. (R. at 746.) Dr. Sheth diagnosed bipolar disorder and encouraged Plaintiff to avoid alcohol and continue taking Klonopin. (R. at 746.)

### c.  Dr. Dolansky's Treatment.

Plaintiff started seeing Dr. Joseph Dolansky, D.O. on April 30, 2008, when she consulted him for medication management. (R. at 745.) Plaintiff did not sleep well, but denied any

auditory or visual hallucinations. (R. at 745.) Dr. Dolansky diagnosed chronic PTSD and bipolar disorder. (R. at 745.)

During Plaintiff's next appointment on June 12, 2008, she reported that Neurontin helped her pain and helped her sleep, but did not help her mood swings. (R. at 744.) Dr. Dolansky noted that Plaintiff's thought content was organized and that she suffered no hallucinations. (R. at 744.) He reduced Plaintiff's dosage of Neurontin and prescribed a sleep medication. (R. at 744.)

On July 25, 2008, Plaintiff reported sleeping better but suffering leg pain. (R. at 743.) Dr. Dolansky increased Plaintiff's dosage of Klonopin and prescribed Gabapentin. (R. at 743.)

On  October 30, 2008, Plaintiff complained to Dr. Dolansky of increased difficulty sleeping because of leg pain. (R. at 742.) Dr. Dolansky recommended that Plaintiff consult Dr. Hawkins with regard to her pain. (R. at 742.)

On February 19, 2009, Plaintiff reported difficulty sleeping and that she was suffering an increase in stress due to a miscarriage and her mother's recent death. (R. at 802.)

On April 21, 2009, Plaintiff complained of side effects from Effexor, including tongue swelling, nausea, headaches, chest pain and heart problems. (R. at 740.) Dr. Dolansky re-prescribed Neurontin and recommended that Plaintiff see a neurologist. (R. at 740.)

During Plaintiff's next appointment, she exhibited racing thoughts and complained of side effects of bruising and drowsiness from her medications. (R. at 739.) Dr. Dolansky reduced Plaintiff's dosage of Klonopin. (R. at 739.)

Dr. Dolansky noted on September 29, 2009, that Plaintiff was noncompliant with Clonazepam. (R. at 799.) Dr. Dolansky reduced Plaintiff's Gabapentin dosage and ordered a platelet count. (R. at 799.)

During Plaintiff's next appointment on December 2, 2009, Dr. Dolansky recorded that Plaintiff's thoughts were organized and that she suffered no side effects from her medications. (R. at 798.)

On February 26, 2010, Dr. Dolansky noted that Neurontin helped Plaintiff's symptoms. (R. at 797.) Plaintiff's self-control was fair and her speech clear. (R. at 738.) Plaintiff reported auditory hallucinations for which Dr. Dolansky prescribed Abilify and recommended that Plaintiff see her neurologist for an EEG. (R. at 738.)

On April 22, 2010, Dr. Dolansky noted that Plaintiff stopped taking Abilify because of side effects of hives. (R. at 796.) Plaintiff was "polite and cooperative" and denied any auditory or visual hallucinations. (R. at 737.)

### d.  Plaintiff's Therapy Records.

On February 7, 2005, Plaintiff sought counseling and medication management at Middle Peninsula-Northern Neck Community Services Board. (R. at 646.) Plaintiff reported to Susan O. K. Campagnola that Plaintiff drank a liter of liquor every weekend after her children were asleep, took up to 7500mg of Tylenol per day and smoked up to two joints of marijuana per day. (R. at 649.) Ms. Campagnola noted that Plaintiff was unemployed, required help managing money and exhibited inappropriate behavior that resulted in intervention by the public health system. (R. at 651.)

Plaintiff returned to Ms. Campagnola for individual psychotherapy on February 14, 2005, and described her migraine headaches. (R. at 645.) Plaintiff was highly active during their discussion. (R. at 645.)

11

Plaintiff saw Ms. Campagnola for individual therapy on March 4, 2005, when she spoke about difficulties with her children. (R. at 643.) Plaintiff did not show for her appointments on March 11, 2005, or March 18, 2005.

On April 15, 2005, Plaintiff presented for her therapy session with Ms. Campagnola and demonstrated hypomanic behavior, difficulty focusing, tangential speech and difficulty understanding questions. (R. at 634.)

Plaintiff demonstrated improved focus during her appointment on May 6, 2005, but still exhibited pressured and tangential speech. (R. at 630.) On May 25, 2005, Plaintiff complained of stress and anger at her son. (R. at 629.)

On June 6, 2006, Plaintiff attended a meeting with Ms. Campagnola and Dr. Mark to discuss her non-compliance with medication and her continued use of alcohol with her medication. (R. at 627.) Plaintiff did not show for her next individual appointment on June 10, 2005, and also did not show for her group therapy session on September 19, 2005. (R. at 620, 624.)

Plaintiff actively participated in group therapy on October 6, 2005, October 17, 2005, and October 20, 2005. (R. at 616-17, 619.) Ms. Clemmons noted that Plaintiff's behavior was appropriate. (R. at 617.)

On November 10, 2005, and December 1, 2005, Plaintiff was active in her group therapy sessions. Plaintiff did not show for her December 8, 2005, group therapy session. (R. at 605.)

On December 15, 2005, Plaintiff tested positive for marijuana use and was told that she would have to start group therapy over again. (R. at 603.) Plaintiff actively participated in group therapy on December 22, 2005. (R. at 601.) On December 29, 2005, Plaintiff actively participated in group therapy and took a BAC test, which showed normal results. (R. at 600.)

Plaintiff actively participated in group therapy about drug recovery on January 5, 2006, but did not show for her group therapy session on January 19, 2006. (R. at 596, 599.) Plaintiff also missed her next group therapy session on January 26, 2006, and her therapists recommended suspension from the program. (R. at 594.)

Plaintiff returned to group therapy on February 2, 2006, when she took a drug test that came back positive for marijuana use. (R. at 588-89.) On February 24, 2006, Plaintiff attended individual therapy with Ms. Clemmons, during which she reported traumatic dreams, memories and flashbacks. (R. at 587.)

Plaintiff was active in group therapy on March 2, 2006, and March 9, 2006, reporting improved control over her anger. (R. at 578, 584.) On March 16, 2006, Plaintiff actively participated in group therapy about alcohol and drug addiction. (R. at 576.) On March 17, 2006, Plaintiff did not show for her individual therapy appointment with Ms. Clemmons. (R. at 573.) Plaintiff actively participated in group therapy about emotional health on March 23, 2006, and a BAC test returned normal results. (R. at 572.) On March 24, 2006, Plaintiff actively participated in group therapy, but was tangentially focused. (R. at 570.) Plaintiff reported increased flashbacks, triggered by specific smells and sounds. (R. at 570.) Ms. Clemmons referred Plaintiff to parenting classes. (R. at 570.)

Plaintiff actively participated in group therapy on March 30, 2005, April 6, 2005, and April 10, 2005. (R. at 565-67.) On April 13, 2006, Plaintiff was late to group therapy and denied her prior positive drug test. (R. at 563.) Plaintiff actively participated in group therapy on April 20, 2006, April 27, 2005, and May 4, 2005. (R. at 558-59, 562.) On May 11, 2006, Plaintiff did not show for her group therapy session. (R. at 555.) Plaintiff participated in group discussion on May 25, 2006, about the consequences of using drugs. (R. at 550-51.) Plaintiff's

13

drug screen on May 26, 2006, came back clean. (R. at 550-51.) On June 1, 2006, Plaintiff actively participated in group therapy on reducing negative thinking. (R. at 548.)

Plaintiff did not show for her individual therapy appointment with Ms. Clemmons on June 19, 2006, but participated in group therapy on June 22, 2006, when she reported finding relaxation by working outside. (R. at 543.) Plaintiff's drug screen was negative. (R. at 543.) On June 29, Plaintiff actively participated in group therapy about depression and anger. (R. at 542.) Plaintiff's drug screen was negative. (R. at 642.) Plaintiff was active in group therapy on July 6, 2006, July 20, 2006, and July 27, 2006, and passed another drug test during the July 27 meeting. (R. at 531, 536, 541.) On December 8, 2006, Plaintiff did not show for group therapy. (R. at 529.)

Plaintiff did not show for her individual therapy appointment with Ms. Clemmons on April 11, 2008. (R. at 782.) On June 5, 2008, she reported mood swings and irritation. (R. at 781.) On June 10, 2008, Plaintiff participated in group therapy, although the leading therapist noted that she seemed defensive. (R. at 780.) Plaintiff attended individual therapy with Ms. Clemmons on August 28, 2008, and September 19, 2008. (R. at 77-77.) On September 24, 2008, Plaintiff did not show for her therapy appointment. (R. at 775.) Plaintiff came in the next day and spoke with Ms. Clemmons about frustrations with her children. (R. at 774.) On October 20, 2008, Plaintiff reported to Ms. Clemmons that her relationship with her boyfriend had improved. (R. at 773.)

Plaintiff reported feeling "clumsy" and said that her fibromyalgia was "acting up" at her therapy appointment on March 5, 2009. (R. at 771.) Plaintiff was compliant with her medications. (R. at 771.) During her therapy appointment on March 12, 2009, Plaintiff reported twitching but told Ms. Clemmons that Klonopin helped her symptoms. (R. at 770.) Plaintiff saw

14

Ms. Clemmons for individual therapy on March 20, 2009, and April 2, 2009, and reported anger at her doctors, noncompliance with her anti-depressant and good results from Klonopin. (R. at 768.) Plaintiff continued to see Ms. Clemmons for individual therapy on May 21, 2009, July 2, 2009, and July 10, 2009. (R. at 762, 765-66.)

On July 13, 2009, Plaintiff went to the Middle Peninsula Northern Neck Community Services Board Clinic and asked to see a therapist for an emergency. (R. at 755.) Plaintiff reported that her boyfriend had threatened to beat her and that she wanted to go to a Women's Shelter. (R. at 755.) Ms. Clemmons recorded that Plaintiff was crying and agitated. (R. at 756.) Ms. Clemmons contacted a shelter, and Ms. Bass took Plaintiff and her daughter to the shelter. (R. at 756.) Ms. Clemmons assessed Plaintiff's GAF as 50.[2] (R. at 756.) Plaintiff's clothing, hygiene and behavior was appropriate, her insight, impulse control and judgment fair, her mood depressed, her memory intact and her intellect average. (R. at 757.)

On January 29, 2010, Plaintiff saw Ms. Clemmons for individual therapy and reported feelings of frustration and sorrow. (R. at 749.) Ms. Clemmons informed Plaintiff that she would be seeing a new therapist at her next appointment. (R. at 749.) Plaintiff did not show for her individual therapy appointment with Clayton Neal, LCSW on April 6, 2010. (R. at 748.) On April 20, 2010, Plaintiff saw Mr. Neal and described feelings of stress and suffering from back pain, migraines and weight gain. (R. at 747.) Mr. Neal noted that Plaintiff's speech was rapid and pressured. (R. at 747.)

---

[2]    A GAF score of 50 falls within a range of "serious symptoms" such as suicidal ideation, severe obsessional rituals, and frequent shoplifting, or "serious impairment" in social, occupational, or educational functioning. DSM-IV-TR 34 (American Psychiatric Association 2000).

### 3. Plaintiff's Treating Physicians' Opinions.

#### a. Dr. Mark's Opinion.

On April 25, 2006, Dr. Mark completed a DDS Mental Status Evaluation form. (R. at 523-37.) Dr. Mark diagnosed Plaintiff with bipolar disorder, mental disorder secondary to head injury/seizure disorder, alcohol abuse, marijuana dependence and a sleep disorder. (R. at 523.) Dr. Mark noted that Plaintiff was "very social" and could relate appropriately to others. (R. at 524, 528.) Plaintiff's attitude, behavior, appearance and orientation were appropriate, her attention span was fair, and her concentration and persistence were within normal limits. (R. at 525-26, 528.) Plaintiff suffered problems sleeping, underwent swift mood changes, lacked the ability to perform calculations, and demonstrated poor judgment and abstract reasoning. (R. at 524-26.) Plaintiff reported auditory, visual, tactile and olfactory hallucinations, but Dr. Mark did not observe any. (R. at 525.) Dr. Mark estimated Plaintiff's IQ at 75 and opined that Plaintiff was capable of managing her own finances. (R. at 526, 528.)   Plaintiff continued to use drugs. (R. at 526.)

On July 23, 2007, Dr. Mark completed a Mental Impairment Questionnaire. (R. at 682-85.) Dr. Mark diagnosed Plaintiff with migraines, asthma and seizures, noting that Plaintiff was currently noncompliant with therapy, but took the seizure medication Klonopin with no side effects. (R. at 682.) Dr. Mark assessed Plaintiff's current GAF as 55 and estimated her highest GAF within the past year as 55. (R. at 682.) Dr. Mark opined that Plaintiff continued to be hypomanic and that she had difficulty focusing due to flashbacks from her PTSD. (R. at 682.) Dr. Mark noted that Plaintiff suffered no perceptual or thinking disturbances and no hallucinations or delusions, but that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and marked deficiencies of concentration,

16

persistence or pace. (R. at 683-84.) Dr. Mark estimated that Plaintiff had suffered one or two

repeated episodes of decompensation, anticipated that Plaintiff's impairments would cause her to

be absent from work more than four days per month and opined that Plaintiff was not a

malingerer. (R. at 684-85.) Dr. Mark considered Plaintiff's prognosis "fair." (R. at 682.)

### b. Dr. Dolansky's Opinion.

On November 16, 2009, Dr. Dolansky completed a Mental Status Evaluation Form in

which he diagnosed Plaintiff with bipolar disorder, PTSD, fibromyalgia, seizures, a cardiac

murmur and migraine headaches. (R. at 1203.) Dr. Dolansky noted that Plaintiff's memory was

impaired and thought content confused, and Dr. Dolansky estimated that Plaintiff could not

concentrate for more than five minutes at a time. (R. at 1205-06.) He opined that Plaintiff could

not complete simple tasks, needed continuous guidance and assistance in making decisions, and

needed assistance to manage her funds. (R. at 1207.)

On May 27, 2010, Dr. Dolansky completed a Mental Impairment Questionnaire in which

he diagnosed Plaintiff with bipolar disorder, PTSD, migraine headaches, fibromyalgia, seizures,

acid reflux disease, asthma and heart palpitations. (R. at 792.) Dr. Dolansky assessed Plaintiff's

current GAF as 34 and estimated her highest GAF in the past year as 38.[3] (R. at 792.) He

opined that Plaintiff had moderate restrictions of activities of daily living, marked deficiencies of

concentration, persistence or pace, extreme difficulties in maintaining social functioning, and

estimated that Plaintiff had suffered four or more repeated episodes of decompensation. (R. at

794.) Dr. Dolansky noted that a minimal increase in mental demands or change in the

environment could cause Plaintiff to decompensate. (R. at 794.) Dr. Dolansky opined that

---

[3]     A GAF score between 31 and 40 falls within a range of "some impairment" in reality
testing or communication, such as illogical, obscure or irrelevant speech at times, or "major
impairment" in several areas such as work, school, family relations, judgment, thinking or mood.
DSM-IV-TR 34 (American Psychiatric Association 2000).

Plaintiff's impairments would cause her to be absent from work more than four days per month and expressed his belief that Plaintiff was not a malingerer. (R. at 795.) Plaintiff could manage benefits in her own interest. (R. at 795.) Her prognosis was "guarded." (R. at 792.)

On July 20, 2011, Dr. Dolansky completed a second Mental Impairment Questionnaire, in which he assessed Plaintiff's current GAF as 30[4] and her highest GAF in the preceding year as 35. (R. at 1505.) Dr. Dolansky noted that Plaintiff did not comprehend basic instructions, had severe mood swings and suffered from anxiety and depression. (R. at 1507-08.) Dr. Dolansky opined that Plaintiff had marked restriction of activities of daily living, marked deficiencies of concentration, persistence or pace, and moderate difficulties in maintaining social functioning. (R. at 1507.) He estimated that Plaintiff had suffered three repeated episodes of decompensation within a twelve-month period and predicted that a marginal increase in mental demands or change in the environment could cause Plaintiff to decompensate. (R. at 1507.) Dr. Dolansky considered Plaintiff unable to manage benefits in her own interest and assessed her prognosis as "poor." (R. at 1505, 1508.)

Dr. Dolansky also completed a Statement of Ability to do Work-Related Activities. (R. at 1509.) He opined that Plaintiff had moderate limitations on her ability to understand, remember and carry out short instructions and her ability to interact appropriately with the public. (R. at 1509-10.) Plaintiff had marked limitations on her ability to understand, remember and carry out detailed instructions, her ability to make judgments on simple work-related decisions, her ability to interact appropriately with supervisors and coworkers, her ability to

---

[4]     A GAF score of 30 falls within a range of behavior "considerably influenced by delusions or hallucinations," or "serious impairment in communication or judgment," or an "inability to function in almost all areas." DSM-IV-TR 34 (American Psychiatric Association 2000).

respond appropriately to pressures in usual work settings and her ability to respond appropriately to changes in routine work settings. (R. at 1509-10.)

4. Plaintiff's Non-treating State Agency Physicians' Opinions.

a. Dr. Sarpolis's Opinion.

On January 11, 2006, DDS physician K. Sarpolis, M.D. completed a Physical RFC Assessment. (R. at 352-59.) Dr. Sarpolis assessed that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and walk with normal breaks for a total of about six hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday, and push and pull without limitation. (R. at 353.) Dr. Sarpolis opined that Plaintiff could stoop, kneel, crawl and crouch frequently and climb stairs occasionally. (R. at 354.) He found that Plaintiff suffered no manipulative, visual or communicative limitations and that she had no problems with extreme temperatures, wetness, humidity, vibrations or fumes. (R. at 355-56.) However, he recommended that Plaintiff avoid concentrated exposure to noise and hazards. (R. at 356.) Dr. Sarpolis considered Plaintiff's statements "partially credible." (R. at 357.)

b. Dr. Kadian's Opinion.

On June 5, 2006, DDS physician R. S. Kadian, M.D. completed a Physical RFC Assessment. (R. at 432-37.) Dr. Kadian assessed that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and walk with normal breaks for a total of about six hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday and push or pull without limitation. (R. at 433.) Dr. Kadian opined that Plaintiff could stoop, balance, kneel, crouch and crawl without limit, and could climb stairs occasionally. (R. at 434.) Dr. Kadian found no manipulative, visual or communicative

limitations. (R. at 434-35.) He assessed Plaintiff's ongoing treatment as conservative and routine in nature and as reasonably effective in controlling her symptoms. (R. at 437.) Dr. Kadian opined that Plaintiff's statements were "partially credible." (R. at 437.)

c. Dr. Cronin's Opinion.

On May 30, 2006, DDS physician Mary Eileen Cronin, Ph.D. completed a Mental RFC Assessment. (R. at 428-31.) Dr. Cronin opined that Plaintiff had mild restrictions of activities of daily living, difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (R. at 425.) Dr. Cronin estimated that Plaintiff suffered one or two repeated episodes of decompensation in a twelve-month period. (R. at 425.)

Plaintiff was not significantly limited in her ability to remember locations, her ability to remember work-like procedures, her ability to understand short, simple instructions, her ability to carry out short and simple instructions, her ability to perform activities within a schedule, her ability to maintain regular attendance and to be punctual within customary tolerances, her ability to work in coordination with or proximity to others without being distracted by them, her ability to make simple work-related decisions, her ability to interact appropriately with the general public, her ability to ask simple questions or request assistance, her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, her ability to maintain socially appropriate behavior, her ability to adhere to the basic standards of neatness and cleanliness, her ability to respond appropriately to changes in the work setting, her ability to be aware of normal hazards and take appropriate precautions, her ability to travel in unfamiliar places or use public transportation, or her ability to set realistic goals and make plans independently of others. (R. at 428-29.)

Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, her ability to sustain an ordinary work routine without special supervision, her ability to complete a normal workday or workweek without interruptions from psychologically based symptoms, her ability to perform at a consistent pace without an unreasonable number and length of rest periods, her ability to carry out detailed instructions and her ability to accept instructions and respond appropriately to criticism from supervisors. (R. at 428-29.) Plaintiff was markedly limited in her ability to understand and remember detailed instructions. (R. at 428.)

Dr. Cronin determined that Plaintiff retained the abilities to manage the mental demands of many types of jobs not requiring complicated tasks. (R. at 430.) Dr. Cronin found Plaintiff "partially credible" and opined that she could meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments. (R. at 431.)

d. Dr. Wright-Good's Opinion.

On September 28, 2007, Dr. June Wright-Good, Psy.D. conducted a consultative examination of Plaintiff and assessed Plaintiff's Full Scale IQ as 74, her Verbal IQ as 71 and her Performance IQ as 80, all values in the borderline range. (R. at 710.) Plaintiff had an estimated GAF of 62[5] and was able to understand and remember simple instructions. (R. at 711.) Plaintiff's insight, judgment and work decisions were fair, she was alert and oriented, and her speech was clear. (R. at 709.) Plaintiff was anxious and pressured at times and could not perform complex tasks. (R. at 709.) Plaintiff had a significant weakness in her ability to recall

---

[5] A GAF of 62 falls within a range of "mild symptoms" such as depressed mood and mild insomnia, or "some difficulty" in social, occupational or educational functioning, but indicates a person who is "generally functioning pretty well" and has "some meaningful interpersonal relationships." DSM-IV-TR 34 (American Psychiatric Association 2000).

letters and numbers sequentially and faced difficulty carrying out complex instructions. (R. at 710-11.)

Dr. Wright-Good opined on October 14, 2007 that Plaintiff had no limitations on her ability to understand, remember and carry out simple instructions and mild limitations on her ability to make judgments on simple work-related decisions. (R. at 712.) Plaintiff had moderate limitations on her ability to understand, remember and carry out complex instructions, her ability to interact appropriately with co-workers, supervisors and the public, and her ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 712-13.) Plaintiff had marked limitations on her ability to make judgments on complex, work-related decisions. (R. at 712.)

5.  Plaintiff's Reported Activities of Daily Living.

On June 17, 2005, Plaintiff completed an Adult Function Report, where she indicated that she took care of her two children and a cat, prepared her own meals every day, cleaned, laundered clothes, went outside, went shopping in stores and by phone for twenty minutes at a time and handled her own finances. (R. at 137-39.) Plaintiff asserted that she did not spend time with others, needed reminders to go places, could not follow spoken instructions well, could not get along with authority figures well and could not handle changes in routine well. (R. at 140-42.) Her condition affected her ability to lift, bend, stand, reach, walk, sit, kneel, talk, hear, climb, see, remember, complete tasks, concentrate, understand, follow instructions and get along with others, but her condition did not affect her ability to squat or use her hands. (R. at 141.) Plaintiff could walk 200 feet before needing to rest. (R. at 141.)

On August 3, 2005, Plaintiff completed a Pain Questionnaire. (R. at 144-45.) Plaintiff reported constant pain in her right hip, right knee, right shoulder, lower back and head. (R. at

22

144.)  Plaintiff described the pain as aching, burning, throbbing, cramping and stabbing in nature and reported that it was made worse by moving, lifting, doing housework and being on her feet. (R. at 144.)  Plaintiff wrote that she could not bend, squat, stoop, reach, stand or sit.  (R. at 145.) Her medications relieved some of the pain, but caused dizziness and nausea as side effects.  (R. at 145.)

On April 11, 2006, Plaintiff completed a second Adult Function Report in which she indicated that she fed, watered, cleaned up after and walked the pets; fed, bathed, dressed, read to and otherwise cared for her children; and cooked, did laundry (with help) and cleaned the house. (R. at 156-158.)  Plaintiff reported that her condition did not affect her ability to dress, bathe, care for her hair, feed herself or use the toilet, but she described difficulty bending down when shaving.  (R. at 157.)  Plaintiff needed neither help nor reminders to take her medicines or care for her personal hygiene, but did need to be reminded to go to her doctor's appointments.  (R. at 158, 160.)  She walked or used public transportation when going out alone and rode in a car with a friend when possible.  (R. at 159.)  Plaintiff shopped in stores twice a week for food, clothing and personal supplies.  (R. at 159.)  She had no problems getting along with others and got along well with authority figures.  (R. at 162.)

Plaintiff reported that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand and use her hands.  (R. at 161.)  However, her impairments did not affect her ability to talk, hear, see, follow instructions or get along with others.  (R. at 161.)  Her pain sometimes kept her up at night, but walking helped the pain.  (R. at 157.)  Plaintiff could only pay attention for one minute at a time.  (R. at 160.)  She watched television every day, spent time talking with others, could finish what she started and could follow written and spoken instructions well.  (R. at 160-61.)

Plaintiff could walk for twenty yards before needing to stop and rest for twenty to thirty minutes. (R. at 161.) Plaintiff described suffering from fears of driving, homelessness, men and news shows. (R. at 162.) Plaintiff handled her own finances. (R. at 159.)

In Plaintiff's second Pain Questionnaire, completed on April 11, 2006, she reported constant pain in her back, knees, feet, shoulders, hips, neck, fingers, wrists and head. (R. at 164.) Plaintiff described the pain as aching, stabbing, burning, throbbing and cramping in nature. (R. at 164.) Plaintiff wrote that her pain made her unable to sit or stand for long periods of time and made her unable to squat, stoop or reach. (R. at 165.) Plaintiff's medications relieved the pain somewhat. (R. at 165.)

On August 29, 2006, Plaintiff completed a third Adult Function Report. (R. at 179.) Plaintiff wrote that she lived with her children, her daughter's father and a friend. (R. at 179.) Plaintiff cooked meals, cleaned dishes, did laundry, fed the animals (including chicks and ducks) and went grocery shopping twice a week, although she needed help with carrying baskets. (R. at 179.) Plaintiff could take care of her own personal needs without assistance, except that she needed help to get out of the bathtub. (R. at 180.) Plaintiff watched television shows for several hours a day and read newspapers, love stories and books about animals. (R. at 180.) She handled her own money, paid bills and took care of her own expenses. (R. at 181.) Plaintiff cooked, laundered clothes and performed simple household chores. (R. at 179.) She slept three to four hours each night due to leg cramps and napped during the day. (R. at 182.) Plaintiff visited friends on the weekends, played cards with friends, read about animals, listened to the radio and attended family cookouts. (R. at 181-82.) Plaintiff reported that she did not get along well with supervisors or co-workers. (R. at 183.)

6.  Third-Party Function Report.

On April 4, 2006, Deborah G. Bass, a Family Support Worker, completed a Third-Party Function Report. (R. at 168.) Ms. Bass advised that she had known Plaintiff for three years and saw her weekly. (R. at 169.) Ms. Bass reported that Plaintiff cooked, kept her house clean, paid bills, fed and cared for animals, and took care of her children. (R. at 169.) Plaintiff went out alone, used public transportation and performed basic personal and grocery shopping for thirty to forty-five minutes at a time. (R. at 172-73.) Plaintiff could pay bills and count change. (R. at 173.) Plaintiff occasionally spent time with others talking, shopping and entertaining. (R. at 174.) Ms. Bass wrote that Plaintiff was limited in lifting, walking, squatting, understanding, following instructions and concentrating. (R. at 174.) Plaintiff could not finish what she started, but she followed spoken instructions if given in steps and got along fine with authority figures. (R. at 175.)

7.  Plaintiff's Hearing Testimony.

On August 1, 2007, Plaintiff testified before an ALJ, stating that she lived alone with her three-year-old daughter. (R. at 1518). Plaintiff fell about five times a month, could not bend much at the waist or knees and could not lift more than five pounds with any regularity. (R. at 1529, 31.) Plaintiff could stand or sit for a maximum of ten minutes, but she did not need a wheelchair or walker. (R. at 1529, 1531.)

Plaintiff testified that she suffered asthma attacks three or four times per day. (R. at 1541.) She cut her smoking from three packs per day to half a pack per day. (R. at 1542-43.) Plaintiff attended therapy appointments, but she missed them frequently because of "transportation issues" or illness. (R. at 1538.) She had problems with crowds, short and long term memory, and could not concentrate long enough to watch anything "major" on television.

(R. at 1540, 1543.) Plaintiff described vision problems, but she did not want to see an eye doctor. (R. at 1543.) She slept for two to three hours at a time. (R. at 1532.)

Plaintiff cared for her daughter during the day with occasional help from a neighbor and her ex-boyfriend. (R. at 1534-45.) She cooked for herself and her daughter, washed dishes and cleaned her home. (R. at 1535.) Plaintiff could dial a telephone, pick a coin up off the table and open a soda can. (R. at 1532.)

Plaintiff testified that she experienced pain and aches in her arms and legs and that seizures and mental stresses kept her from doing any sort of work. (R. at 1526.) She rated her pain at seven on a scale of one-to-ten. (R. at 1528.) She applied for work at a fast food restaurant, but she was unable to get an interview after explaining her limitations. (R. at 1521.)

Plaintiff testified at a second ALJ hearing on June 8, 2010, and she stated that she lived with her daughter and her daughter's father. (R. at 1558.) Plaintiff reported having auditory and visual hallucinations and smoking a pack of cigarettes per day with plans to gradually reduce to half a pack per day. (R. at 1561, 1572-73.)

Plaintiff saw a psychiatrist every two or three months. (R. at 1571.) She described mood swings from happiness to depression to anger in a matter of minutes. (R. at 1571.) She could not remember simple instructions. (R. at 1572.) Plaintiff indicated that she had not used alcohol since 2007. (R. at 1561.)   Plaintiff described suffering pain in her legs, but she reported that getting up and moving around helped control the pain. (R. at 1567.)

### 8.  Vocational Expert's Testimony.

A vocational expert also testified at the June 8, 2010 hearing. (R. at 1580-1591.) The VE testified that a hypothetical individual of the same age and educational background as Plaintiff and sharing Plaintiff's limitation to simple, unskilled work involving limited contact

with the general public, occasional balancing, climbing and stooping and absence of concentrated noise, hazards, fumes and odors would be capable of performing the light jobs of assembler of small products and unarmed security guard, and the sedentary jobs of bench assembler and hand packer/worker, all of which existed in the national and local economies in significant numbers. (R. at 1582-84.) The VE testified that these job descriptions were consistent with the Dictionary of Occupational Terms ("DOT"), except for unarmed security guard. (R. at 1584.) Although the DOT lists unarmed security guard as a light and low-level semi-skilled job, the VE testified that based on her professional knowledge of the job, Plaintiff could perform the job of unskilled unarmed security guard and jobs existed in the economy in significant numbers. (R. at 1584.)

The VE further testified that if Plaintiff's condition required her to miss more than four days of work per month or caused moderate to severe problems getting along with co-workers, Plaintiff could not sustain employment. (R. at 1587.) A ninth grade educational level was adequate for the jobs described, and a low IQ probably would not impact any of these jobs, except for possibly unarmed security guard. (R. at 1587-88.)

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI on June 17, 2005, claiming disability due to bipolar disorder, drug and alcohol dependence and abuse, borderline intellectual functioning, a complex partial seizure disorder, asthma, a myofascial pain syndrome, an overactive bladder with urinary incontinence and migraine headaches, with an amended onset date of May 25, 2005. (R. at 22.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[6] (R.

---

[6]     Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404,

at 17, 48.) On August 1, 2007, Plaintiff testified at a hearing before an ALJ. (R. at 1511-53). On November 30, 2007, the ALJ issued a decision finding that Plaintiff was not under a disability as defined by the Act. (R. at 44-58.) The Appeals Council granted Plaintiff's request for review, and a second ALJ hearing was conducted on June 8, 2010. (R. at 1554-92.) On July 20, 2010, Plaintiff was again denied benefits. (R. at 16-31.) A second request for review by Plaintiff was denied, making the ALJ's July 20, 2010 decision the final decision of the Commissioner and subject to judicial review by this Court. (R. at 7-10.)

### III. QUESTIONS PRESENTED

A. Does substantial evidence exist to support the ALJ's determination to afford Plaintiff's treating physicians' opinions less than controlling weight?

B. Does substantial evidence exist to support the ALJ's determination that jobs which Plaintiff can perform exist in the national economy in significant numbers?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, but less than a preponderance; it is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility

---

subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(citation and quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001)

(quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the

record as a whole, the Court must "take into account whatever in the record fairly detracts from

its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal*

*Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The

Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are

conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While this

standard is high, if the ALJ's determination is not supported by substantial evidence on the

record, or if the ALJ has made an error of law, the district court must reverse the decision.

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

    To determine if a claimant is eligible for benefits, an ALJ conducts a sequential

evaluation of a claimant's work and medical history on behalf of the Commissioner. 20 C.F.R.

§§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. On appeal, a court must examine this analysis

to determine whether the correct legal standards were applied and whether the resulting decision

of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at

176-77.

    The first step in the sequence asks whether the claimant was working at the time of her

application, and, if so, whether the work constituted "substantial gainful activity" ("SGA").[7] 20

---

[7]    SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R.
Substantial work activity is "work activity that involves doing significant physical or mental
activities. Your work may be substantial even if it is done on a part-time basis or if you do less,
get paid less, or have less responsibility than when you worked before." 20 C.F.R.
§ 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a
profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks

C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the claimant must be

found "not disabled" regardless of any medical condition, and the analysis ends. *Id.* If the

claimant establishes that she did not engage in SGA, the second step of the analysis requires her

to prove that she has a "severe impairment . . . or combination of impairments which

significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R.

§ 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment entitling the

claimant to benefits under the Act, the impairment must cause more than a minimal effect on the

claimant's ability to function. 20 C.F.R. § 404.1520(c).

The third step of the sequential analysis asks whether the claimant has an impairment that

meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of

impairments) and has lasted for twelve months, is expected to last for twelve months, or is

expected to result in death. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has such an

impairment, the analysis ends and the claimant is found disabled. *Id.* If the impairment does not

meet or equal a listed impairment, the evaluation proceeds to the fourth step, in which the ALJ is

required to determine whether the claimant can return to her past relevant work[8] based on an

assessment of her residual functional capacity ("RFC")[9] and the "physical and mental demands

---

or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[8]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[9]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If the claimant is capable of performing her past relevant work, benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, requiring her to prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

If the claimant cannot perform her past relevant work, the burden shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can satisfy this burden with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions, accurately representing the claimant's RFC based on all evidence on the record and fairly describing all of the claimant's impairments, to which the VE may respond with testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). A VE's testimony is only "relevant or helpful" when the hypothetical posed represents all of the claimant's substantiated impairments. *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

A. The ALJ's Opinion.

On July 20, 2010, the ALJ rendered his decision in a written opinion and determined that, based on Plaintiff's application for SSI beginning on May 25, 2005, Plaintiff was not disabled as

defined in the Act. (R. at 20, 31); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). The ALJ followed the five-step sequential evaluation process established by the Act to evaluate whether Plaintiff was disabled. (R. at 20); *see also* 20 C.F.R. § 404.1520(a). At step one, the ALJ determined that Plaintiff had not engaged in SGA since the alleged onset date of May 25, 2005. (R. at 22); *see also* 20 C.F.R. §§ 404.1571, 416.971. At step two, the ALJ determined that Plaintiff suffered severe impairments in the form of a bipolar disorder, drug and alcohol dependence/abuse, borderline intellectual functioning, a complex partial seizure disorder, asthma, a myofascial pain syndrome, an overactive bladder with urinary incontinence and migraine headaches. (R. at 22); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).

At step three, the ALJ determined that Plaintiff's impairments did not meet or equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22); *see also* 20 C.F.R. §§ 404.1520(d), 404.1525-26, 416.920(d) and 416.925-26. At step four, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she was limited to "simple, unskilled work with limited contact with the general public, occasional climbing, balancing and stooping, and she needs to avoid concentrated exposure to noise, hazards, fumes and odors." (R. at 24.) At step five, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 30.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 31.)

Plaintiff now challenges the weight that the ALJ assigned to the opinions of Dr. Mark and Dr. Dolansky, her treating physicians. (Pl.'s Mem. at 4.) Plaintiff also challenges the ALJ's decision at step five, arguing that the ALJ relied upon flawed VE testimony. (Pl.'s Mem. at 8.)

Defendant asserts that substantial evidence supports the ALJ's decision. (Def.'s Mot. Summ. J. and Mem. in Supp. "Def.'s Mem." (ECF No. 14) at 9.)

      B. Substantial evidence supports the ALJ's determination to afford Plaintiff's treating physicians' opinions less than controlling weight.

Plaintiff argues that the ALJ erred in assigning less than controlling weight to the opinions of Plaintiff's treating physicians. (Pl.'s Mem. at 8.) Specifically, Plaintiff contends that the opinions of her psychiatrists, Dr. Mark and Dr. Dolansky, should have been afforded controlling weight. (Pl.'s Mem. at 8.) Defendant responds that substantial evidence supported the ALJ's evaluation of the doctors' opinions. (Def.'s Mem. at 9.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's provided medical records and any medical evidence resulting from consultative examinations or ordered expert medical evaluations. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). However, if the medical opinions are internally inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 73 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. The ALJ is not required to accept opinions from

a treating physician when the physician's opinion is inconsistent with other evidence or is otherwise not well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e); *Jarrells v. Barnhart*, No. 7:04cv411, 2005 U.S. Dist. LEXIS 7495, at *9-10 (W.D. Va. Apr. 26, 2005).

When evaluating a treating physician's opinion, the ALJ must consider: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(d)(2)-(6). However, the regulations vest the ALJ, not the treating physician, with the authority to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1).

Here, the ALJ assigned less than controlling weight to the opinions of Dr. Mark and Dr. Dolansky, because they were inconsistent with the objective findings of mental status examinations, the conservative nature of Plaintiff's medical treatment and Plaintiff's admitted activities of daily living. (R. at 29.) In finding that Plaintiff's RFC enabled her to engage in limited light work, the ALJ reconciled the divergent opinions offered by Plaintiff's treating physicians and by state agency physicians by ultimately giving "some" weight to all opinions, but controlling weight to none. (R. at 29-30.)

1. Dr. Mark's Opinion.

On July 23, 2007, Dr. Mark opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, marked deficiencies of concentration, persistence or pace, and estimated that Plaintiff had suffered one or two repeated episodes of decompensation. (R. at 684.) Dr. Mark anticipated that Plaintiff's impairments would cause Plaintiff to be absent from work more than four days per month. (R. at 685.)

34

Dr. Mark's opinion is inconsistent with her treatment notes.  While Dr. Mark opined in 2007 that Plaintiff would miss more than four days of work per month due to her impairments, throughout 2006 and 2007, her treatment notes reflect Plaintiff's condition as stable and improving with medication.  (R. at 686-87, 689.)  On April 25, 2006, Dr. Mark evaluated Plaintiff as "very social," with a "fair" attention span and with abilities of attention, concentration and pace that were within normal limits.  (R. at 524, 526, 528.)  On September 27, 2006, Dr. Mark assessed that Plaintiff appeared "much calmer, less irritable, better able to focus" and that her sleep, appetite and energy were "good."  (R. at 689.)  On March 13, 2007, Dr. Mark noted that Klonopin improved many of Plaintiff's symptoms.  (R. at 687.)  Plaintiff's status was "relatively stable" on June 12, 2007, when Dr. Mark assessed that the Klonopin still helped Plaintiff's symptoms and that Plaintiff's behavior control had improved.  (R. at 686.)

Further, Plaintiff's own reported activities of daily living, assessments of the Third Party Function Report and opinions of other doctors in the record are inconsistent with Dr. Mark's opinion.  Despite Plaintiff's impairments and symptoms, she reported in 2006 that she cared for herself and her children, prepared her own meals, cleaned her home, shopped in stores for food, clothes and personal supplies, and handled her own finances.  (R. at 156, 158-60.)  Ms. Bass reported that Plaintiff prepared her own food, shopped in stores, spent time with others talking, shopping and entertaining, and used public transportation or walked when going out.  (R. at 171-74.)  On October 4, 2007, Dr. Wright-Good assessed Plaintiff's GAF at 62 and opined that Plaintiff's insight, judgment and work decisions were fair and that Plaintiff was alert, oriented and able to understand, remember and carry out simple instructions.  (R. at 709, 711-12.)  On October 29, 2009, Dr. Patterson assessed Plaintiff's seizures as "under relatively good control"

from the medication Clonazepam, even though Plaintiff had a history of noncompliance in taking the medicine.  (R. at 734, 1211.)

Plaintiff repeatedly reported in 2007 and later that her medications were helping to control her symptoms.  (R. at 686-87.)  On March 12, 2009, and April 2, 2009, Plaintiff reported that the medication Klonopin was improving her symptoms of twitching associated with seizures and of talking to herself.  (R. at 762, 768.)  Because Dr. Mark's opinion is inconsistent with her medical records and the record as a whole, substantial evidence supports the ALJ's determination to afford Dr. Mark's opinion only some weight, rather than controlling weight.

2.  Dr. Dolansky's Opinion.

Dr. Dolansky opined on November 1, 2009, that Plaintiff was unable to complete simple tasks, needed continuous guidance and assistance in making decisions, and needed assistance managing her funds.  (R. at 1207.)  On May 27, 2010, Dr. Dolansky opined that Plaintiff had moderate restrictions of activities of daily living, marked deficiencies of concentration, persistence or pace, extreme difficulties in maintaining social functioning and had suffered four or more repeated episodes of decompensation within a twelve month period.  (R. at 794.)  On July 20, 2011, Dr. Dolansky opined that Plaintiff had marked restriction of activities of daily living, marked deficiencies of concentration, persistence or pace, moderate difficulties in maintaining social functioning and had suffered three repeated episodes of decompensation within a twelve month period.  (R. at 1507.)

Dr. Dolansky also completed a Statement of Ability to do Work-Related Activities in which he opined that Plaintiff had moderate limitations on her ability to understand, remember and carry out short instructions and on her ability to interact appropriately with the public.  (R. at 1509-10.)  Plaintiff had marked limitations on her ability to understand, remember and carry out

detailed instructions, her ability to make judgments on simple, work-related decisions, her ability

to interact appropriately with supervisors and coworkers, her ability to respond appropriately to

pressures in a usual work setting and her ability to respond appropriately to changes in a routine

work setting.  (R. at 1509-10.)

      Dr. Dolansky's opinions are inconsistent with Plaintiff's treatment notes.  Dr. Dolansky's

treatment notes reflect little change in Plaintiff's medications beyond increasing and reducing

dosages in response to Plaintiff's complaints about side effects.  (R. at 797, 798-800.)  On

December 2, 2009, Dr. Dolansky reported that Plaintiff's thoughts were organized and that she

reported suffering no side effects from her medications.  (R. at 798.)  On February 26, 2010, Dr.

Dolansky noted that Neurontin was helping Plaintiff's symptoms and prescribed no change in

medications.  (R. at 797.)  Dr. Dolansky assessed Plaintiff's GAF as 34 in May 2010 and as 30 in

July 2011, but Plaintiff's treatment and medications after these assessments remained largely

unchanged and she required no hospitalizations.

      Further, Dr. Dolansky's findings are contradicted by Plaintiff's reported activities of

daily living.  Plaintiff reported that she could get along with authority figures and peers, hosted

family and friends for occasional weekend visits, occasionally played cards with friends and

attended family cookouts.  (R. at 161-62, 181-82.)  Plaintiff shopped in stores for food, clothes

and personal supplies, and handled her own finances.  (R. at 156, 158-60.)  In addition, Plaintiff

indicated that she cared for her daughter and the family's animals, cooked, cleaned, watched

television, read books and maintained her household.  (R. at 161, 182, 1533, 1535.)

      Similarly, on August 1, 2007, and on June 8, 2010, Plaintiff attended hearings before the

ALJ.  (R. at 1513, 1556.)  Both of these hearings lasted almost two hours, and Plaintiff

understood questions, answered clearly and remained attentive throughout the proceeding, indicating a significant attention span. (R. at 161, 430, 1513, 1553, 1556, 1592.)

Additionally, other doctors' opinions are contrary to Dr. Dolansky's opinion. On April 25, 2006, Dr. Mark evaluated Plaintiff as "very social," with a "fair" attention span and with abilities of attention, concentration and pace that were within normal limits. (R. at 524, 526, 528.) On May 30, 2006, Dr. Cronin opined that Plaintiff was not significantly limited in her ability to interact appropriately with the general public and get along well with others and that Plaintiff's attention span was sufficient to allow her to remember work procedures and carry out short and simple instructions. (R. at 428-30.) On July 13, 2009, Elizabeth Clemmons, LPC assessed that Plaintiff possessed average intellect, fair impulse control, fair judgment and insight, and an intact memory. (R. at 757.)

Because Dr. Dolansky's opinion is inconsistent with his medical records and the record as a whole, substantial evidence supports the ALJ's decision to afford only some weight, rather than controlling weight, to Dr. Dolansky's opinion.

> C. Substantial evidence supports the ALJ's determination that jobs exist in the national economy that Plaintiff can perform.

Plaintiff argues that the ALJ erred in relying on the VE's testimony, because the VE was not present for the entire hearing, the VE's testimony with respect to the unarmed security guard job was inconsistent with the DOT, the VE failed to provide specific DOT numbers for the jobs that she recommended, and the VE failed to consider several limitations assessed by Plaintiff's doctors. (Pl.'s Mem. at 8-9, 11.) Defendant responds that substantial evidence supported the ALJ's determination that jobs exist in the national economy that Plaintiff can perform.

At step five of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other

38

work that is available in significant numbers in the national economy. 20 C.F.R. §§ 4.16.920(f), 404.1520(f). The testimony of a VE may act as substantial evidence discharging that burden. *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004). When a VE is called to testify, the ALJ's function is to pose hypothetical questions accurately representing all of the claimant's impairments so that the VE may offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

Here, the ALJ asked the VE to consider a hypothetical individual, of the same age and educational background as Plaintiff, who could perform light, simple, unskilled work with limited contact with the general public, occasional balancing, climbing and stooping, avoiding concentrated noise, hazards, fumes and odors. (R. at 1583.) In response, the VE testified that such an individual could perform the light jobs of assembler of small products and unarmed security guard, as well as the sedentary jobs of bench assembler and hand packer/worker, all of which existed in the local and national economies in significant numbers. (R. at 1583-84.) The VE testified that these jobs were consistent with the Dictionary of Occupational Titles ("DOT"), except for the job of unarmed security guard. (R. at 1583-84.) The VE explained that although unarmed security guard was listed in the DOT as a "semi-skilled" job, the VE, based on her professional knowledge of the job, believed that an individual such as Plaintiff who was limited to simple, unskilled work, could perform the job. (R. at 1584.)

First, Plaintiff contends that the VE should have been present for the entire hearing, rather than only for her own testimony. (Pl.'s Mem. at 8.) Plaintiff cites no law, and the Court is not aware of any law that requires that the VE be present for the entire hearing. As described above, substantial evidence supports Plaintiff's RFC. The hypotheticals posed to the VE by the ALJ took into account Plaintiff's limitations and RFC, (R. at 1582-84), and substantial evidence

39

supports the conclusion that the ALJ reached.  Accordingly, Plaintiff's argument that the VE's absence during portions of the hearing constitutes reversible error is without merit.

Second, Plaintiff argues that because the VE's testimony with respect to Plaintiff's ability to perform the job of unarmed security guard was inconsistent with the DOT, the ALJ is precluded from relying on it.  (Pl.'s Mem. at 8-9.)  However, the VE in this case specifically explained that although the unarmed security guard job was listed as semi-skilled in the DOT, based on her professional experience, Plaintiff could perform the job.  (R. at 1584.)  When a VE's testimony is in apparent conflict with the DOT, an explanation based on the VE's "professional placement experience" is sufficient to allow the ALJ to rely on the testimony. *Rogers v. Astrue*, 312 F.App'x 138, 142 (10th Cir. 2009); *see also Blow v. Astrue*, 2010 WL 1489976, at *11 (E.D. Va. March 17, 2010) (affirming ALJ's decision after noting that "while the DOT identifies the position of unarmed security guard as semiskilled, the VE testified that, based on his experience, it is an unskilled position").

Third, Plaintiff argues that the VE erred in failing to provide specific DOT numbers for the jobs that she recommended.  (Pl.'s Mem. at 9.)  However, the VE is not required to provide DOT numbers, and DOT numbers are not necessary to demonstrate the accuracy of VE testimony.  *Irelan v. Barnhart*, 82 Fed. App'x 66, 72 (3rd Cir. 2003) (finding that "there is no legal basis for [Plaintiff's] argument that 'if the claimant is to adequately test the accuracy of the VE testimony, the DOT numbers must be available'").  Further, Plaintiff's representative was present at the administrative hearing and, accordingly, had the opportunity to request specific DOT numbers from the VE, but chose not to do so.

Plaintiff's fourth argument is that the VE erred in failing to consider several limitations assessed by Dr. Mark, Dr. Dolansky and Dr. Wright-Good when determining the jobs that

Plaintiff could perform. (Pl.'s Mem. at 11.)  However, the VE's determination was based on the

limitations described by the ALJ, who is only required to convey to the VE those limitations that

he considers credibly established.  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3rd Cir. 2005).

Here, the ALJ determined that Plaintiff had the RFC to perform light work as defined in

20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she was limited to "simple, unskilled work

with limited contact with the general public, occasional climbing, balancing and stooping and

she needs to avoid concentrated exposure to noise, hazards, fumes and odors." (R. at 24.)  This

determination is supported by substantial evidence.

The ALJ's determination that Plaintiff was limited to simple, unskilled work is supported

by Ms. Bass's report dated April 4, 2006, noting that Plaintiff was limited in understanding and

following instructions, but followed spoken instructions if given in steps and got along fine with

authority figures. (R. at 175.)  On April 11, 2006, Plaintiff reported that she could finish what

she started and followed written and spoken instructions well. (R. at 160-61.)  Her impairments

did not affect her ability to follow instructions. (R. at 161.)  On May 30, 2006, Dr. Cronin

opined that Plaintiff was not significantly limited in her ability to remember work-like

procedures or in her ability to understand and carry out short, simple instructions. (R. at 428-29.)

On October 4, 2007, Dr. Wright-Good opined that Plaintiff was able to understand, remember

and carry out simple instructions. (R. at 709.)  On October 14, 2007, Dr. Wright-Good opined

that Plaintiff had no limitations on her ability to understand, remember and carry out simple

instructions. (R. at 712.)

Similarly, the ALJ's determination to limit Plaintiff to work involving limited contact

with the general public is supported by the record. On April 4, 2006, Ms. Bass reported that

Plaintiff went out alone, used public transportation and performed basic personal and grocery

shopping. (R. at 172-73.) Plaintiff spent time with others talking, shopping and entertaining. (R. at 174.) Plaintiff got along fine with authority figures. (R. at 175.) On April 11, 2006, Plaintiff reported that she had no problems getting along with others and got along well with authority figures. (R. at 162.) Plaintiff shopped in stores, used public transportation and went out alone. (R. at 159.) On May 30, 2006, Dr. Cronin opined that Plaintiff was not significantly limited in her ability to maintain socially appropriate behavior. (R. at 428-29.) On August 29, 2006, Plaintiff reported that she went grocery shopping and visited friends and family. (R. at 179, 181-82.) On October 14, 2007, Dr. Wright-Good opined that Plaintiff had moderate limitations on her ability to interact appropriately with co-workers, supervisors and the public. (R. at 713.) On July 20, 2011, Dr. Dolansky opined that Plaintiff had moderate limitations on her ability to interact appropriately with the public. (R. at 1509-10.)

Finally, the ALJ's decision to limit Plaintiff's work ability to that involving occasional climbing, balancing and stooping, and avoiding concentrated exposure to noise, hazards, fumes and odors was supported by the record. On January 11, 2006, Dr. Sarpolis opined that Plaintiff could stoop, kneel, crawl and crouch frequently and climb stairs occasionally, but should avoid concentrated exposure to noise and hazards. (R. at 354, 56.) On April 11, 2006, Plaintiff reported pain when stooping, but also reported that her medications partially relieved that pain. (R. at 165.) On May 30, 2006, Dr. Cronin opined that Plaintiff was not significantly limited in her ability to be aware of normal hazards and to take appropriate precautions. (R. at 428-29.) On June 5, 2006, Dr. Kadian opined that Plaintiff could stoop, balance, kneel, crouch and crawl without limit and could climb stairs occasionally. (R. at 434.) All of this evidence supported the ALJ's decision.

Because substantial evidence supported the ALJ's RFC determination and that determination was included in the hypothetical posed to the VE, the VE's testimony was proper and constituted substantial evidence supporting the ALJ's determination that significant numbers of jobs exist in the national economy that Plaintiff can perform.

## VI.  CONCLUSION

Based on the foregoing analysis, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED;  and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable John A. Gibney with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except on grounds of plain error.**

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: September 4, 2013

43